UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JAMES DIEFFENBAUCH, Individually & on
behalf of all similarly situated,

                Plaintiff,

   v.

                                                                Civ. Action No.: 17-cv-01180

RHINEHART RAILROAD CONSTRUCTION, INC.,

                Defendant.
_____


# MEMORANDUM OF LAW IN SUPPORT

# OF DEFENDANT'S MOTION TO DECERTIFY THE COLLECTIVE ACTION


Dated: July 7, 2020
       Rochester, New York

                                    UNDERBERG & KESSLER LLP
                                    Attorneys for Defendant
                                    300 Bausch & Lomb Place
                                    Rochester, New York 14614
                                    Telephone: (585) 258-2800

                                    Paul F. Keneally, Esq., of Counsel
                                    Alina Nadir, Esq., of Counsel

**PRELIMINARY STATEMENT**

Defendant submits this Memorandum of Law in support of Defendant's Motion to Decertify the Collective Action.  For the reasons described in this Memorandum, as well as the supporting Affidavit of Richard Rhinehart, sworn to July 6, 2020 ("Rhinehart Aff.") and the accompanying Attorney Affirmation of Alina Nadir, Esq., dated July 7, 2020 ("Nadir Aff."), Defendant's motion should be granted decertifying the collective action and dismissing the claims of the Opt-In Plaintiffs without prejudice.

**PROCEDURAL BACKGROUND**

In October 2017, Plaintiff James Dieffenbauch filed this action against Rhinehart Railroad Construction, Inc. ("Rhinehart").  In the Complaint, Mr. Dieffenbauch alleged that Rhinehart "expects that Railroad Workers will travel from project locations away from home and back to home without compensation."  (Dkt. No. 5 at p.2).  Mr. Dieffenbauch also claimed that Rhinehart "only paid Plaintiff(s) for hours at the job site." (Dkt. No. 5 at

Mr. Dieffenbauch filed for conditional certification soon after (Dkt. No. 10), and on August 30, 2018, the Court granted the motion for conditional certification, but limited the class to laborer/operators that worked in the following states: Maryland, Massachusetts, New York, North Carolina, and Pennsylvania.  (Dkt. No. 38).  Discovery ensued, and Defendant now moves to decertify the collective action.

**FACTUAL BACKGROUND**

Rhinehart is a Maryland corporation with a primary business of building railroads and performing related services.  (Rhinehart Aff. ¶ 4).  Rhinehart completes discrete projects for a limited amount of time in the various states. (Rhinehart Aff. ¶ 5).  Much of Rhinehart's day-to-day labor is done by laborers/operators. (Rhinehart Aff. ¶ 9).  Given

2

the nature of Rhinehart's business and geographic area, laborers/operators sometimes end up working on different projects, and some of these projects are not within the laborers/operators' home community. (Rhinehart Aff. ¶¶ 10, 12, 13). Rhinehart typically also employs individuals local to a project as laborers/operators. (Rhinehart Aff. ¶ 12). For longer-term Rhinehart laborers/operators, their job site may vary as their roles on a particular project change or end. (Rhinehart Aff. ¶ 13).

Each project that Rhinehart undertakes is unique. (Rhinehart Aff. ¶ 15). For each project, the location, the type of work, the duration, the individuals assigned, the customer, and the supervision varies. (Rhinehart Aff. ¶¶ 15, 16). Each project has its own schedule, usually determined by the individual supervisor on that project after consultation and input from the customer. (Rhinehart Aff. ¶¶ 16, 17).

Rhinehart's laborers/operators make different choices as far as traveling to and from work on the weekends and during off-hours. It is up to each laborer/operator how he or she chooses to get to the job site for work. (Rhinehart Aff. ¶ 18). Again, each job site typically also has local laborers/operators who do not need to travel away from their home community to get to work. (Rhinehart Aff. ¶ 21). Some laborers/operators ride as passengers to job sites with co-workers. (Rhinehart Aff. ¶ 19). Not all laborers/operators return to their home community every weekend. (Rhinehart Aff. ¶ 20).

Rhinehart does not have a "No Pay for Travel" policy. (Rhinehart Aff. ¶ 14). No such policy is contained within the Employee Handbook. (Rhinehart Aff. ¶ 14). No such policy has been issued officially or unofficially. (Rhinehart Aff. ¶ 14). There is no such verbal policy.

Depositions Taken of Representative Sample of Opt-In Plaintiffs

Four plaintiffs were deposed during discovery as a representative sample of the Opt-In Plaintiffs, and their testimony was vastly different when it came to allegations of unpaid travel time.

Hugh Cullen

Hugh Cullen worked for Rhinehart from April 2015 until January 2019, and his Supervisor throughout that time was JP Johnson (Nadir Aff., Exhibit A (hereinafter referred to as "Cullen Depo") at 27). He claimed that he was told by one of the Rhineharts that he was not going to be paid travel time on jobs that paid prevailing wage, but he could not recall who may have said that. (Cullen Depo at 15, 16, 27). He then stated that a "rate job" would have travel to the site paid, but "never" paid for the travel home. (Cullen Depo at 16). His next sentence was that "anything over an hour you got paid for travel." (Cullen Depo at 16). He later described an alleged policy in the Rhinehart Employee Handbook that stated that "anything over an hour you get paid for travel." (Cullen Depo at 26).

Mr. Cullen also explained that as his driver's license was suspended when he began working for Rhinehart, he could not drive himself to job sites. He was a passenger and never drove himself or his own vehicle to a job site. (Cullen Depo at 20, 32). When he first started working for Rhinehart, five passengers rode with one driver when he traveled to job sites. After that, three passengers drove with the driver. (Cullen Depo at 46). Mr. Cullen was not directed by Rhinehart on any particular way that he had to arrive at a job site or when he had to travel. (Cullen Depo at 30). He could leave the day before or leave the morning before he had to start his shift if he so chose. (Cullen Depo at

4

31). Mr. Cullen claimed that his Supervisor, Mr. Johnson, told him that only one way of travel was paid. (Cullen Depo at 28). Mr. Cullen would check his paystub and call his supervisor or upper management to get his paycheck corrected if it was incorrect. (Cullen Depo at 34).

When the instant lawsuit was first filed and prior to notice being sent to plaintiffs, Mr. Cullen believed that he was paid travel time consistent with the law. (Depo 55; Nadir Aff., Exhibit G).

Kenneth Hites

Mr. Hites worked for Rhinehart on two occasions and most recently from 2012 until August 2018. (Nadir Aff., Exhibit B (hereinafter referred to as the "Hites Depo") at 6). He was supervised by JP Johnson for at least part of his time with Rhinehart, but he had many Supervisors. (Hites Depo at 28, 31, 32). Mr. Hites also believed the policy at Rhinehart was that any travel over one hour was paid. (Hites Depo at 32, 33). Mr. Hites did not believe there to be a policy that Rhinehart only paid for travel one way as Mr. Cullen alleged. (Hites Depo at 33, 35).

If Mr. Hites believed a check was missing compensable time, he would bring it to whomever his Supervisor was at the time, and it would either be fixed or it was determined to not fit within compensable time. (Hites Depo at 33). He complained that he may have traveled six hours on an occasion, but only been paid for two. (Hites Depo at 33). He claimed the Supervisor was responsible for turning in an employee's time. (Hites Depo at 34).

Mr. Hites was occasionally a passenger, but he also drove his own vehicle to job sites. (Hites Depo at 40). He would also invite passengers to ride to job sites with him.

5

(Hites Depo at 40, 41).  Mr. Hites sometimes drove Rhinehart's vehicles to job sites, but also drove his personal vehicle other times.  (Hites Depo at 41, 48).  He alleged that he recalls one occasion on which he was not paid compensable travel time.  (Hites Depo at 43, 44).  He does not know why that time was not paid and stated it may have been because a Supervisor did not turn in the time.  (Hites Depo at 43, 44).  Mr. Hites never kept track of the hours that he worked.  (Hites Depo at 46).  When the instant lawsuit was first filed and prior to notice being sent to potential Opt-In Plaintiffs, Mr. Hites believed, to the best of his knowledge, that he was paid travel time consistent with the law.  (Hites Depo at 55; Nadir Aff., Exhibit F).

When asked when he would typically travel to arrive at a job site, he said often [he and his travel companions] would leave at midnight.  (Hites Depo at 60).  Sometimes they would leave Sunday evenings.  (Hites Depo at 60).  He said it just depended on the circumstances of that job and "what the supervisor decided for the day," especially as Mr. Hites often traveled with his Supervisor JP Johnson (Hites Depo at 60).  Sometimes the decision of when to leave for a job was up to Mr. Hites, and he would "leave at the latest [he] could leave."  (Hites Depo at 62).  He would have passengers with him often when he traveled during the night.  (Hites Depo at 62).  Mr. Hites had the option of arriving at the job site however he chose.  (Hites Depo at 64).  He could take a bus if he desired. (Hites Depo at 64).

Mr. Hites agreed that he was paid for some travel time.  (Hites Depo at 67).  For example, he was paid two hours of travel time three days in a row on one occasion.  (Hites Depo at 68-69).  On some jobs, some of the laborers would be local employees who lived

6

in the vicinity of the job, including on the Newton Falls job in New York.  (Hites Depo at 74, 75).

Travis Dailey

Mr. Dailey began working at Rhinehart in July 2015 until approximately July 2018 with a period of time during which he worked for a different employer.  (Nadir Aff., Exhibit C (hereinafter referred to as the "Dailey Depo") at 23).  Mr. Dailey worked as a Superintendent.  (Dailey Depo at 28). As Superintendent, he was responsible for recording the hours worked of the employees on his crew.  (Dailey Depo at 29) He believes the policy for travel pay was that employees would be paid to and from their home within two hours of their home.  (Dailey Depo at 35).  He also believed that if the job site was further than two hours away, only one way travel was paid.  (Dailey Depo at 36).  Mr. Dailey said that as Rhinehart became larger, he was paid for his travel time. (Dailey Depo at 37).  He then says it changed when he was assigned to work in Maryland and complained that he and his passengers were paid five hours of travel time even though the trip took seven hours.  (Dailey Depo at 37).  He often drove up to three other employees to job sites.  (Dailey Depo at 39).

Mr. Dailey testified that he was told at one point that the travel policy was "working hours," but that he did not get more specificity than that.  (Dailey Depo at 47).  He says he was "always [] paid job to job." (Dailey Depo at 48).  He believes that he was suddenly not paid for travel from job to job in 2019 and testified that Rhinehart was doing that "to [him] anyways," indicating he did not have knowledge about other employees.  (Dailey Depo at 48).  Mr. Dailey testified that for a period of time when he had to travel between Boston and New York for different jobs, when he traveled from New York he received the

7

prevailing wage for travel time. (Dailey Depo at 57). He testified that although there were sometimes errors, [Rhinehart] would fix it. (Dailey Depo at 57). Mr. Dailey entered the travel time for his crew. (Dailey Depo at 61). Mr. Dailey testified that there was a policy that travel time was not paid on a prevailing wage job, but that when Mr. Dailey did not enter travel time for employee Mark Glaser, Mr. Glaser complained to the Rhineharts and received travel pay. (Dailey Depo at 61-62). Mr. Dailey could not recall who may have told him that travel time was not paid on prevailing wage jobs. (Dailey Depo at 62).

Mr. Dailey did not keep track of the hours he traveled, nor did he keep any EZ pass or toll receipt records. (Dailey Depo at 62-63). Mr. Dailey testified he usually traveled to a job site on Sundays beginning around 11:00 a.m. He often drove and had employees riding in his car with him. (Dailey Depo at 75-76). On some jobs he would decide to stay in the hotel near the job site rather than travel home on the weekend. (Dailey Depo at 77-78). Employees could choose to travel to the hotel near the job site via public transportation or a private vehicle. (Dailey Depo at 80). Mr. Dailey recalled more than one employee traveling to the job in a camper on the job sites on which he worked. (Dailey Depo at 83). He agreed that when travel time was noted in his payroll records, it meant the time was paid. (Dailey Depo at 86-88). He stated that as Superintendent, he would communicate policy regarding travel time to his crew. (Dailey Depo at 89).

Mr. Dailey recalled an occasion on which he was paid travel time, but believed a couple other employees were not. (Dailey Depo at 91).

Karen Fuller

Ms. Fuller testified on behalf of her brother Scott Fuller who passed away in October 2017. (Nadir Aff., Exhibit D (hereinafter referred to as "Fuller Depo") at 6). She

claimed he would travel on Sundays and back home on Friday after he was done working and would complain that he did not receive travel time (Fuller Depo at 15). She later testified that Mr. Fuller did not specifically say that he was never paid travel time or only paid some travel time. (Fuller Depo at 48). She was not aware whether Mr. Fuller was or was not paid for travel time on many of his jobs. (Fuller Depo at 55). She was not aware of any policy Rhinehart had that stated it would not pay travel time. (Fuller Depo at 45). His Supervisor may have been Darrin Ricketts. (Fuller Depo at 16). Mr. Fuller would usually drive to his job sites in his personal vehicle and when his son, Randy, also worked for Rhinehart, they would sometimes drive together. (Fuller Depo at 24, 26). He had previously rode as a passenger for approximately a year or two as well. (Fuller Depo at 33).

Ms. Fuller recalled that Mr. Fuller's work schedule depended on the job. (Fuller Depo at 27, 28). The schedule could be affected by the location of the job and the weather there. (Fuller Depo at 27). Ms. Fuller produced a calendar she says Mr. Fuller kept regarding his travel time, but the calendar does not contain the times at which Mr. Fuller drove. Ms. Fuller indicated that there was no consistent time that Mr. Fuller and individuals with whom he drove would leave to arrive at a job site. (Fuller Depo at 34-35).

Mr. Fuller did not always travel home on the weekends. (Fuller Depo at 50). On at least one occasion, Mr. Fuller and some of his co-workers rented a cottage near a job site and stayed there during the duration of the job. (Fuller Depo at 48).

Discovery Requests

Defendant issued document demands and interrogatories to all Opt-In Plaintiffs in this matter. (Nadir Aff. at ¶¶ 8, 9). Many of the Opt-In Plaintiffs failed respond fully to the discovery requests. (Nadir Aff. at 10, 11; *see also* Defendant's Motion to Compel and/or Dismiss, Dkt. No. 75). Defendant issued interrogatories to all Opt-In Plaintiffs in January 2020, and as of the date of this motion, responses have only been received on behalf of eight (8) Opt-In Plaintiffs. (Nadir Aff. at ¶ 11). The responses to the interrogatories that were forwarded to Defendant contained identical responses from each opt-in plaintiff. (Nadir Aff. at ¶ 12, Exhibit E). None of the responses contained details regarding the Opt-In Plaintiffs' contentions that they were subject to a common policy or practice other than identical, boilerplate responses clearly drafted by an attorney. None of the responses contain any details as to the basis of each opt-in plaintiff's contention that he or she is for owed unpaid travel time.

## ARGUMENT

Section 216(b) of the FLSA authorizes collective actions where employees are "similarly situated." *See Ruiz v. Citibank, N.A.*, 93 F. Supp. 3d 279, 297 (S.D.N.Y. 2015). Courts in the Second Circuit use a two-step analysis in determining whether to certify a class under Section 216(b). *Myers v. Hertz Corp.*, 624 F.3d 537, 554 (2d Cir. 2010). The first step, in which a Court decides whether notice should be sent to potentially similarly-situated plaintiffs, requires only "a modest factual showing that the plaintiffs and potential Opt-In Plaintiffs together were victims of a common policy or plan that violated the law." *Holick v. Cellular Sales of N.Y., LLC*, Civ. No. 23-CV-584, 2019 U.S. Dist. LEXIS 70399, at *10 (N.D.N.Y. Apr. 26, 2019) (internal citations omitted).

10

The second step requires that a Court determine whether the Opt-In Plaintiffs in a conditionally certified class "are in fact similarly situated to the named plaintiffs." *Id.* If they are not, the action may be decertified. *Id.* The Court applies "heightened scrutiny", *Desilva v. N. Shore-Long Island Jewish Health Sys., Inc.* 27 F. Supp. 3d 313, 319 (E.D.N.Y. 2014), and a more "stringent standard of proof" at this second step of certification to determine "whether plaintiffs are similarly situated for the purposes of the FLSA." *Ruiz v. Citibank, N.A.*, 93 F. Supp. 3d 279, 297-8 (S.D.N.Y. 2015). The burden at this stage is on the named plaintiff to demonstrate that the Opt-In Plaintiffs are similarly situated. *Holick*, 2019 U.S. Dist. LEXIS 70399, at *10.

Plaintiffs must show more than that they just "share an employer, a job title, and a professed entitlement to wages." *Ruiz*, 93 F. Supp. 3d at 300 (finding decertification appropriate where the plaintiffs' evidence relied heavily on "anecdotal allegations of violations [and] secondhand statements regarding companywide policy").

A Court analyzing whether certifying a class is appropriate at the second step typically considers: "(1) disparate factual and employment settings of the individual plaintiffs; (2) defenses available to defendants which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." *Id.* at *11 (internal citations omitted). Where the Opt-In Plaintiffs are not "similarly-situated," the collective action should be decertified and the Opt-In Plaintiffs' claims dismissed. *Myers*, 624 F.3d at 555; *see also Anderson v. Cagle's Inc.*, 488 F.3d 945, 953 (11th Cir. 2007) ("At this second stage, "[l]ogically the more material distinctions revealed by the evidence, the more likely the district court is to decertify the collective action." (internal citations omitted)).

11

I.    **Opt-In Plaintiffs Are Not Similarly Situated Pursuant to Section 216(b)**

A. Opt-In Plaintiffs' Differences in Factual and Work Settings Require Decertification

Where there are disparate factual and work settings among the Opt-In Plaintiffs, it weighs heavily in favor of decertification. *Hernandez v. Fresh Diet, Inc.*, 2014 U.S. Dist. LEXIS 139069, at *16 (S.D.N.Y. Sept. 29, 2014).

Plaintiffs cannot carry their burden at this more stringent second stage of certification. The testimony provided at the sample of depositions consisted of only anecdotal evidence of a few examples where an employee believes he was not paid when he believes he should have been. Further, the basis upon which the Opt-In Plaintiffs base their allegations are largely completely different alleged secondhand statements from the many Supervisors that Rhinehart employs. Discovery has shown there is no consistent practice or policy at Rhinehart to fail to pay compensable time. Rather the evidence shows Rhinehart did pay travel time.

Plaintiff's Complaint specifically mentions two FLSA provisions in relation to his allegations about unpaid overtime. (Dkt. No. 5). Specifically, he alleges that he and similarly situated Plaintiffs were not paid for travel that is all in a day's work as required by 29 C.F.R. 785.38 and that he and similarly situated Plaintiffs for travel away from the home community as required by 29 C.F.R. 785.39.

29 C.F.R. 785.38 provides:

> Time spent by an employee in travel as part of his principal activity, such as travel from job site to job site during the workday, must be counted as hours worked. Where an employee is required to report at a meeting place to receive instructions or to perform other work there, or to pick up and to carry tools, the travel from the designated place to the work place is part of the day's work, and must be counted as hours worked regardless of contract, custom, or practice. If an employee normally finishes his work on the premises at 5 p.m. and is sent to another job which he finishes at 8 p.m. and is required to return to his employer's premises arriving at 9 p.m., all of the time is working time. However, if

> the employee goes home instead of returning to his employer's premises, the travel after 8 p.m. is home-to-work travel and is not hours worked.

29 C.F.R. 785.39 requires that certain time spent traveling away from an employee's home community is compensable, but does not require that any and all travel away from a home community is compensable. 29 C.F.R. 785.39 specifically provides that:

> Travel that keeps an employee away from home overnight is travel away from home. Travel away from home is clearly worktime when it cuts across the employee's workday. The employee is simply substituting travel for other duties. The time is not only hours worked on regular working days during normal working hours but also during the corresponding hours on nonworking days. Thus, if an employee regularly works from 9 a.m. to 5 p.m. from Monday through Friday the travel time during these hours is worktime on Saturday and Sunday as well as on the other days. Regular meal period time is not counted. As an enforcement policy the Divisions will not consider as worktime that time spent in travel away from home outside of regular working hours as a passenger on an airplane, train, boat, bus, or automobile.

Per 29 C.F.R. 785.39, travel away from the home community is compensable only when it cuts across the employee's workday, including the employee's normal work hours on weekends. The regulation explicitly excludes from worktime <u>any</u> time spent as a passenger in an automobile.

Discovery has shown that the allegations of Rhinehart's common policy or plan of failing to pay travel time contained in the Complaint are simply incorrect. Mr. Dieffenbauch alleged that Rhinehart "only paid Plaintiff(s) for hours at the job site," and that Rhinehart "expects that Railroad Workers will travel from project locations away from home and back to home without compensation." (Dkt. No. 5). Time records and the Opt-In Plaintiffs' deposition testimony disprove those allegations. (Nadir Aff., Exhibits A, B, C, D; Rhinehart Aff. at ¶¶ 23-28, Exhibits A, B, C, D, E). Further, at the time of the filing of the Complaint, Mr. Dieffenbauch knew that allegation to be patently false as he himself has received payment for travel time on many occasions. (Rhinehart Aff. at ¶ 23).

The lack of a uniform illegal policy or practice and the testimony provided in the Opt-In Plaintiffs' depositions make clear that individualized inquiries abound in this matter. Each deponent that worked at Rhinehart testified that they were paid for at least some travel time. One deponent could only specifically recall one occasion on which he believed he was owed paid travel time but was not compensated. (Hites Depo at 43, 44). And the fact that not every minute of travel time was paid does not indicate an illegal policy per se. The federal regulations do not require every minute of travel away from the home community or every minute that an employee drives to a job be compensated.

To determine Rhinehart's liability, if any, the following factors at a minimum must be considered as to each Opt-In Plaintiff for each occasion on which the plaintiff claims compensable travel time:

- If the plaintiff traveled away from the home community to work at a particular job site;
- if the plaintiff performed local jobs, and if so, the location of his or her home in relation to the job site;
- if the plaintiff rode as a passenger in a co-worker's vehicle to a job site;
- if the plaintiff took public transportation to a job site;
- if the plaintiff drove his or her own vehicle to the job site;
- if the plaintiff was required to drive a Rhinehart vehicle to the job site;
- if the plaintiff transported any Rhinehart equipment when traveling;
- if the plaintiff spent the weekends at a job site rather than traveling home;
- if the plaintiff traveled during non-working hours, during working hours, or a combination of both;
- if the plaintiff was, in fact, already compensated for travel time; and
- the working hours of each particular job.

Based upon the representative sample of Opt-In Plaintiffs who were deposed, it is clear that the circumstances vary greatly between the individual plaintiffs. In fact, the circumstances varied depending on the job site for each employee as well. Discovery has proven that the Opt-In Plaintiffs were not required to travel at certain times of the day or

under circumstances. They were free to choose when they traveled. They were free to drive their own car, take public transportation, or ride with a co-worker when possible.

The Opt-In Plaintiffs' lack of responses to Defendant's discovery requests further undercut their allegations of a common illegal policy or plan. While many of the Opt-In Plaintiffs failed to respond fully to Defendant's discovery requests (Defendant addresses Opt-In Plaintiffs' noncompliance with their discovery obligations in its Motion to Compel and/or Dismiss (Dkt. No. 75)), those that did respond provided no additional information that would support certification in this matter. The responses to the interrogatories, in particular, which were received on behalf of only eight (8) Opt-In Plaintiffs, were identical in each submission and contained not a shred of specific information as to the basis of each Opt-In Plaintiffs' contention that he or she is owed for unpaid travel time. (Nadir Aff., Exhibit E).

Defendant asked for information regarding dates of alleged unpaid time or the locations in which the unpaid time accrued. More generally, Defendant asked for the circumstances regarding time that each Opt-In Plaintiff believes to be wrongfully uncompensated. Not one of the eight (8) responding Opt-In Plaintiffs provided a single occasion or example of travel time that was uncompensated but that the Opt-In Plaintiff believed to be compensable. (Nadir Aff., ¶ 11, 12; Exhibit E). It is unbelievable that not a single plaintiff who answered the interrogatories could recall a single day of travel that he or she believes to be uncompensated in violation of the FLSA.

Given the multitude of differences between the Opt-In Plaintiffs, a collective action is not appropriate in this matter. The use of representative proof at trial would be deficient. The conflicting testimony regarding what supposed policy existed regarding travel time at

Rhinehart, along with the complicated analyses required for each Opt-In Plaintiff to determine Rhinehart's liability, if any, renders this group of Opt-In Plaintiffs ill-suited for certification at this more stringent second step.

### B. Rhinehart's Individualized Defenses to the Opt-In Plaintiffs' Claims Require Decertification

Certification is only appropriate where "liability can be proven on a class-wide basis, and the only material difference among plaintiffs is the amount of damages owed to each of them." *Lugo v. Farmer's Pride, Inc.*, 737 F. Supp 2d 291, 303 (E.D.Pa. 2010); s*ee also King v. West Corp.*, 2006 U.S. Dist. LEXIS 3926, 2006 WL 118577, *15 (D. Neb. Jan. 13, 2006) (decertifying a class in part because defendant intended to offer individualized defenses regarding whether uncompensated work occurred, whether time spent performing such work was de minimis, and whether the plaintiffs had scheduling flexibility). "Simply put, a defendant cannot be expected to come up with representative proof when the plaintiffs cannot reasonably be said to be representative of each other." *Holick*, 2019 U.S. Dist. LEXIS 70399, at *23-24.

Where there is no uniform policy or practice, "plaintiffs will have to demonstrate that each individual manager had actual or constructive knowledge that plaintiffs were performing off-the-clock work without proper compensation." *DeSilva*, 27 F. Supp. 3d at 325 (individualized defenses existed where testimony suggested the knowledge of each manager about allegedly unpaid time varied widely).

The deposition testimony provided by Opt-In Plaintiffs in this matter demonstrate the highly individualized nature of Rhinehart's defenses to the Opt-In Plaintiffs' claims. Each Opt-In Plaintiff testified to alleged different travel practices as far as departure times, driving their own vehicles or riding as passengers, different understandings of the "policy"

regarding travel time, different alleged statements by their Supervisors, and the varying nature of each job.

While the Opt-In Plaintiffs may argue that all that is left to determine is the amount of damages for each opt-in plaintiff, that is not supported by the evidence.  Pay records show multiple instances where Opt-In Plaintiffs were paid travel time.  The Opt-In Plaintiffs have not demonstrated that any instance in which they did not receive travel time, that travel time was, in fact, due.  Certainly, in some instances, travel pay was not due.  Some deponents testified that they would travel to a job site late Sunday evening to be there for an early job on Monday morning.  That time is unlikely to be compensable as most, if not all, of that travel time is not taking place during the normal working hours.  In addition, the regulation specifically states that time spent as a passenger in an automobile is not compensable time.  Testimony showed that multiple people went to job sites as passengers in vehicles, and that time is also not compensable.

In addition to all of many defenses available to Defendant on each of the Opt-In Plaintiffs' claims, some of the Opt-In Plaintiffs may not be properly before this Court.  This issue is fully described in Defendant's Motion to Dismiss Out-of-State Plaintiffs filed July 7, 2020.  (Dkt. No. 76).  As some of the Opt-In Plaintiffs never worked within the State of New York, their claims should be dismissed by this Court for lack of personal jurisdiction.

C. <u>Fairness and Procedural Considerations Require Decertification</u>

The FLSA collective action vehicle was designed to allow plaintiffs to pool resources and allow courts to efficiently resolve claims with common facts and issues of law, but "where there appears to be substantial different employment experiences among the various opt-ins the procedural advantages of a collective action cannot be realized."

*Stevens v. HMSHost Corp.*, 2014 U.S. Dist. LEXIS , at *22 (E.D.N.Y. Aug. 26, 2014) (internal citations omitted) (finding where the nature of evidence would require "mini-trials" for each of the opt-ins, decertification was appropriate); *see also Holick*, 2019 U.S. Dist. LEXIS 70399, at *26 (fairness and procedural considerations weighed in favor of decertification where the plaintiffs' "own deposition testimonies reflect glaring disparities with regard to material factors underlying the central legal issues [of the] case.")

The varying nature of the testimony provided by the representative sample of deponents in this matter weighs against decertification. The individualized nature of each Opt-In Plaintiffs' allegations would necessitate that each and every opt-in plaintiff provide testimony at trial; no one representative or sample of representatives could properly represent the Opt-In Plaintiffs' as a whole. *See DeSilva*, 27 F. Supp. 3d at 328 (quoting *Reed v. County of Orange*, 266 F.R.D. 446, 450 C.D.Cal. 2010) ([d]ecertification is appropriate where plaintiffs are subject to varying work conditions in different work locations or under different supervisors," and where "the disparity between Plaintiffs' factual and employment settings as to . . . [] result[] in highly individualized questions of fact that make proceeding as a collective action impractical and prejudicial to the parties").

Adding to the fairness and procedural concerns is the fact that most, if not all, of the Opt-In Plaintiffs are beyond the subpoena power of the Court. FRCP 45(c). As described in Defendant's recently filed Motion to Compel or Dismiss, most of the Opt-In Plaintiffs have failed to fully meet their discovery obligations. And given the many differences between each Opt-In Plaintiff, a representative sample of testimony will be insufficient in this matter. The testimony of each and every Opt-In Plaintiff will be necessary to prove each of their claims. As Defendant will not be procedurally able to

compel their appearance given their physical distance from the Court, the fairness and procedural considerations weigh in favor of decertification.

## **CONCLUSION**

After over a year of discovery, Plaintiff has no more substantive evidence today than he did upon moving for conditional certification that he and the Opt-In Plaintiffs are similarly situated and that a collective action is appropriate here. For the foregoing reasons, the Court should grant Defendant's motion to decertify this collective action and dismiss the claims of the Opt-In Plaintiffs without prejudice.

Dated: July 7, 2020
      Rochester, New York

                                  UNDERBERG & KESSLER LLP

                                  /s/ Alina Nadir

                                  Paul F. Keneally, Esq.
                                  Alina Nadir, Esq.
                                  *Attorneys for Defendant*
                                  300 Bausch & Lomb Place
                                  Rochester, New York 14604
                                  Telephone: 585-258-2800
                                  pkeneally@underbergkessler.com
                                  anadir@underbergkessler.com

4852-1806-4834, v. 2